**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)**

HOLLY AYERS,

       Plaintiff

v.

TOWN OF ELKTON, MARYLAND,

       Defendant

**Case No. 1:23-cv-01952-SAG**

<u>**PLAINTIFF'S OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
AND REQUEST FOR HEARING**</u>

## TABLE OF CONTENTS

I. Introduction and Background ................................................................. 1

II. Standard of Decision .......................................................................... 9

III. Disputes of Material Fact ................................................................. 9

IV. Argument ....................................................................................... 11

    A.  Plaintiff is a "qualified individual with a disability"....................... 11

    B.  Plaintiff engaged in protected activity; there is evidence her demotion
        was retaliatory ......................................................................... 17

    C.  The Town failed to provide a reasonable accommodation............... 23

    D.  The Town's motion should be denied as to Lt. Ayers' MFEPA claims .......... 29

V. Conclusion ....................................................................................... 29

Request for Hearing............................................................................... 29

Exhibits

    1. Affidavit of Holly Ayers

    2. Holly Ayers' Answers to Interrogatories Excerpt

    3. Job Description – Special Operations Lieutenant

    4. Job Description – Patrol Sergeant

    5. Fit-for-Duty Psychological Evaluation of Holly Ayers

    6. Chief Rogers' Letter of Concern

    7. Chief Rogers' Demotion Letter

    8. Holly Ayers' Request for Reasonable Accommodations

    9. Chief Rogers' Response to Request for Reasonable Accommodations

    10. Denial Letter re. Request for Reasonable Accommodations

    11. Holly Ayers' Deposition Excerpts

12. Matthew Donnelly Deposition Excerpts

13. Joseph Zurolo Deposition Excerpts

14. Caroly Rogers Deposition Excerpts

## I.    <u>Introduction and Background</u>.

This case arises from disability discrimination, harassment, refusal to grant reasonable accommodations, retaliation, and constructive discharge of Plaintiff Holly Ayers ("Lt. Ayers") by Defendant Town of Elkton, Maryland ("the Town"). Lt. Ayers began working for the Elkton Police Department ("the Department") in 1994. She served as a Patrol Officer for the Elkton Police from 1994 until 1999. Beginning in 1999, she worked for the Elkton Police in specialized units. (Ex. 2.)

On November 2, 2014, Lt. Ayers was promoted to the rank of Lieutenant. She served as Special Operations Lieutenant from 2014 until April 2021, when she was wrongfully demoted. (Ex. 2; Ex. 12 at 7.)

In her role as Special Operations Lieutenant, Lt. Ayers oversaw and coordinated numerous high profile and high priority matters for the Department. For example, she oversaw the Street Crimes Unit ("SCU"), the Criminal Investigation Division ("CID"), and the School Resource Officers. Her duties in this role were primarily sedentary, and included managing detectives, overseeing criminal investigations, internal affairs investigations, as well as collaborating with the United States Bureau of Alcohol, Tobacco, and Firearms (ATF) on gun-related matters. Lt. Ayers also led and contributed to efforts relating to budgets and policies for the Department. (Ex. 2.)

Lt. Ayers was fully dedicated to the Department and strove to provide the highest level of service to the Department and the Town. She frequently responded to calls in the middle of the night to supervise investigations of serious crimes, such

as murders. Her supervisors praised her. Throughout her career in the Department, she consistently received positive performance reviews. At all relevant times, she performed her job duties satisfactorily, and in fact, excelled in her role. (Ex. 2.)

Lt. Ayers is an individual with a disability within the meaning of the ADA and MFEPA. She suffers from Raynaud's syndrome, which was first diagnosed in the 1990s. One of the symptoms of her Reynaud's is that she is unable to remain in a cold environment for prolonged periods. (Ex. 2.)

Lt. Ayers also suffers from multiple sclerosis ("MS"). She was first diagnosed with MS in September 2019. Her symptoms include foot drop affecting her left foot; numbness, paresthesia, stiffness, spasms, and muscle weakness, affecting her left foot and left arm and hand; periodic difficulties with coordination if in an environment of extreme heat for a prolonged period of time; and general fatigue and heat intolerance. (Ex. 1; Ex. 2.)

Lt. Ayers' disabilities substantially limit her in multiple major life activities, including her ability to walk or run long distances in high temperatures, and her ability to engage in vigorous physical activity for prolonged time periods in high temperatures. Her disabilities did not limit her ability to perform the essential functions of her job as Special Operations Lieutenant in the Department. In that role, she worked indoors, performing managerial and administrative duties in an office. Her position did not require her to walk or run long distances, spend prolonged periods outdoors, or wear uniform patrol shoes. She was able to perform the essential

functions of her job as Special Operations Lieutenant while wearing non-patrol shoes that accommodated her foot drop. (Ex. 2.)

Lt. Ayers has no knowledge—from her decades of experience in the department—of any officers in positions comparable to Special Operations Lieutenant, who were required to work for prolonged periods outdoors, walk or run long distances, or wear uniform patrol shoes. During her time as Special Operations Lieutenant, from 2014-2021, she was not required to wear a police uniform, except for certain special, public events. Likewise, other "plain clothes" officers in the department were not required to regularly wear police uniforms. (Ex. 2.)

Lt. Ayers successfully performed all the essential functions of the job of Special Operations Lieutenant from 2014-2021. The essential functions of the position are listed in a written Job Description issued by the Department. (Ex. 3.) Lt. Ayers was fully capable of performing—and successfully performed—all the essential functions of the job. (Ex. 1.)

Former Elkton Police Chief Matthew Donnelly testified that he promoted Lt. Ayers to the rank of Lieutenant shortly after he became the Chief in 2014. (Ex. 12 at 7.) He served as the Chief and Lt. Ayers' second line supervisor until he retired in 2020.[1] (Ex. 12 at 5-6.) Chief Donnelly testified that from the time he promoted Lt. Ayers in 2014 until his retirement in 2020, she performed her job as a Lieutenant satisfactorily and had no performance or conduct issues. (Ex. 12 at 7-8.) He was aware that she had MS, but did not observe any symptoms that prevented her from doing

---

[1] Chief Donnelly testified that he was Lt. Ayers' second line supervisor "on paper," but he was effectively her direct supervisor on a day-to-day basis. (Ex. 2 at 8.)

her job. (Ex. 12 at 11-12.) Chief Donnelly specifically testified that during the six years he supervised Lt. Ayers from 2014-2020, she successfully performed all the essential functions of the position of Special Operations Lieutenant as described in the Job Description.[2] (Ex. 12 at 13-15.)

Capt. Joseph Zurolo was Lt. Ayers' direct supervisor from 2014-2020, and served as Acting Chief from July-November 2020. (Ex. 13 at 7-8.) He testified that she had no performance or conduct issues. (Ex. 13 at 10-11.) Capt. Zurolo was also aware that Lt. Ayers had MS, but did not see her experience any symptoms on the job. (Ex. 13 at 11-12.) He testified that she performed all the essential functions of the position of Special Operations Lieutenant as described in the Department's Job Description.[3] (Ex. 13 at 13-15.)

In November 2020, the Town promoted Carolyn Rogers to the position of Chief of Police. (Ex. 14 at 14.) Chief Rogers had known and worked with Lt. Ayers since 1994. (Ex. 14 at 15-16.) When she became the Chief in November 2020, Chief Rogers held a deep-seated enmity toward Lt. Ayers based on previous work-related disputes, hearsay, and department gossip. (Ex. 14 at 36-58.)

Chief Rogers' litany of grievances against Lt. Ayers is at odds with all other evidence in this case. Lt. Ayers had an excellent performance record. (Ex. 2.) None of the alleged incidents about which Chief Rogers complained resulted in any

---

[2] Chief Donnelly testified that two of the essential functions listed in the Job Description—Public Information Officer and school resource officer—were not part of the position during Lt. Ayers' time in the role and therefore he could not testify that she performed those functions. (Ex. 2 at15.)

[3] Capt. Zurolo testified that one of the essential functions on the Job Description, Public Information Officer, was not within Lt. Ayers' duties. (Ex. 13 at 14.)

disciplinary action against Lt. Ayers. Both of Lt. Ayers' prior supervisors, Chief Donnelly and Capt. Zurolo, testified that she had no performance or disciplinary issues. (Ex. 12 at 7-8; Ex. 13 at 10-11.) There is no witness testimony or other evidence in the record of any allegations of misconduct or performance failures by Lt. Ayers, other than the specious allegations—based almost entirely on hearsay—by Chief Rogers.

Nevertheless, from the time she was promoted to Chief, Chief Rogers was intent on terminating Lt. Ayers' employment. Within the first week after Chief Rogers was appointed, she met with Kathy Metzler, who was then the head of Human Resources for the Town, to discuss her plan to terminate Lt. Ayers. (Ex. 14 at 64-66, 69-70.) Chief Rogers testified that when she met with Ms. Metzler, she was "looking for suggestions. What can I do[?] Am I able to terminate her[?]" (Ex. 14 at 70.)

Chief Rogers' bizarre fixation on Lt. Ayers and immediate intention to terminate her is incongruous with all other evidence in the record and the testimony of the two previous Chiefs. Chief Donnelly testified that Chief Rogers and Lt. Ayers had "locked horns a couple times," but he believed he had resolved the issues "through conversation with each of them." (Ex. 12 at 17.) He said that "they didn't get along," but they worked in different areas of the Department and so "their paths didn't always cross." (Ex. 12 at 17-18.) Chief Donnelly did not consider these spats to rise to the level of requiring any disciplinary action against either officer. (Ex. 12 at 18-19.) He testified that he was surprised to learn that Chief Rogers intended to terminate Lt. Ayers from the very outset of her tenure as Chief. (Ex. 12 at 19-20.) At the time

he retired in August 2020—just four months before Chief Rogers was appointed—he was not aware of any grounds for Lt. Ayers to be terminated or demoted. (Ex. 12 at 21.) Likewise, Capt. Zurolo, who was Lt. Ayers' direct supervisor and the Acting Chief preceding Chief Rogers' tenure, testified that he was not aware of anything that he considered grounds for her termination or demotion. (Ex. 13 at 17.)

In her deposition, Chief Rogers effectively admitted that she had no grounds to terminate Lt. Ayers. Asked, "what would have been the grounds for termination you were considering right when you were appointed chief," Chief Rogers responded: "Well, that's why I went to [Ms. Metzler] because I wanted to know what the grounds would be." (Ex. 14 at 70-71.) In other words, Chief Rogers was looking for a way to terminate Lt. Ayers, and hoping the Town's head of HR would help her come up with something.

Chief Rogers testified that on the advice of Ms. Metzler, she instead decided to meet with Lt. Ayers in December 2020 to outline her expectations. (Ex. 14 at 71-77.) Lt. Ayers testified that she met with Chief Rogers in December 2020, but it was not a discussion about the Chief's expectations of her. (Ex. 11 at 23-28.)

Lt. Ayers testified that she had another meeting with Chief Rogers in January 2021, during which she disclosed her disabilities and physical limitations in detail. (Ex. 11 at 29-32.) Chief Rogers denies that this discussion took place. (Ex. 9, Resp. to RA Request.)

After learning of the nature and extent of Lt. Ayers' disabilities and physical limitations, on April 21, 2021, Chief Rogers wrote a lengthy "Letter of Concern" to

6

Ms. Metzler listing various alleged complaints she says other officers relayed to her about Lt. Ayers ("Letter of Concern"). (Ex. 6.) Chief Rogers' complaints and accusations against Lt. Ayers are entirely based on hearsay. She claims to have had conversations with various officers who allegedly expressed complaints about Lt. Ayers. (Ex. 6.) There is no evidence in the record of any such complaints, other than Chief Rogers' hearsay statements.[4]

Chief Rogers' unsupported claim that numerous officers complained about Lt. Ayers is implausible given that it had never happened before in her twenty-seven-year career. Indeed, Chief Donnelly—who promoted Lt. Ayers to Lieutenant and supervised her for six years—testified that "a couple of times" one or two officers complained to him about Lt. Ayers' supervision, he talked to the officers under her supervision, and he determined that the complaints did not warrant any further action. (Ex. 12 at 9-11.)

In her Letter of Concern, Chief Rogers stated that Lt. Ayers "will be terminated from employment immediately." (Ex. 6 at 5.) Yet, instead of terminating Lt. Ayers, one week later she demoted her to the position of Patrol Sergeant "for administrative, non-punitive reasons," which were different reasons than those listed a week earlier in her Letter of Concern.[5] (Ex. 7.) Chief Rogers testified that the only reason she issued the demotion for "administrative, non-punitive reasons" is because if she had taken action for "punitive reasons" it would have been a termination, and "that process would be long" because it would have implicated Lt. Ayers' procedural rights

---

[4] Lt. Ayers has rebutted each of the allegations. (Ex. 1.)
[5] Lt. Ayers has also rebutted these allegations. (Ex. 1.)

under the Maryland Law Enforcement Officer's Bill of Rights, including a right to notice of the charges, an opportunity to respond, and a hearing before a trial board.[6] (Ex. 14 at 150-51.) By demoting Lt. Ayers, Chief Rogers achieved the same result as terminating her—because she knew that based on Lt. Ayers' disabilities she could not fully perform the job of a Patrol Sergeant—but without having to prove her allegations or give Lt. Ayers an opportunity to defend herself.

On May 13, 2021, Lt. Ayers submitted a written request for reasonable accommodations, explaining that she could not perform all of the functions of the position of Patrol Sergeant due to her disabilities. (Ex. 8.) Days later, Chief Rogers wrote a furious email to Ms. Metzler denying that she was previously aware of the details and limitations associated with Lt. Ayers' disabilities, falsely claiming that Lt. Ayers could not perform any job within the Department, and demanding that the request for reasonable accommodations be denied. (Ex. 9, Resp. to RA Requ.) On June 17, 2021, as ordered by Chief Rogers, Ms. Metzler informed Lt. Ayers that her request was denied. (Ex. 10.) The Town failed to engage in the interactive process to try to determine a workable accommodation for Lt. Ayers, and failed to offer her any reasonable accommodations. On December 6, 2021, Lt. Ayers was forced to retire from the Department. (Ex. 2.)

Lt. Ayers brought this action against the Town for violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and Maryland Fair Employment Practices Act ("MFEPA"), Md. Code, State Gov't § 20-601 *et seq.* (*See*

---

[6] *See* Md. Code, Public Safety § 3-106.

Compl., ECF No. 1.) The Town now seeks summary judgment to avoid having to defend its actions before a jury. As explained below, there are numerous disputes of material fact that preclude summary judgment, and the Town is not entitled to judgment as a matter of law. This motion should be denied.

## II.    **Standard of Decision.**

The Court may grant summary judgment only if "the moving party demonstrates, through particular parts of materials in the record . . . that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c)(1)(A). The question before the Court is whether, considering the entire record, there are facts from which "a reasonable jury could return a verdict for the nonmoving party." *J.D. by Doherty v. Colonial Williamsburg Found.*, 925 F.3d 663, 669 (4th Cir. 2019) (internal quotation marks omitted). In considering this question, the Court does "not weigh conflicting evidence or make credibility determinations." *Id*. Rather, the Court must view all facts and draw all reasonable inferences "in the light most favorable to the non-moving party." *Id*. (internal quotation marks omitted). "If there are genuine issues of material fact that can only be resolved by a factfinder, then the motion for summary judgment must be denied." *Id*.

## III.    **Disputes of Material Fact.**

Under Fed. R. Civ. P. 56(a), the Court may grant summary judgment only "if the movant shows that there is no genuine dispute as to any material fact." It is not clear from the Town's motion which facts it claims are material and undisputed, or

9

whether it contends that all of the facts in the "Statement of Facts" section of its motion are undisputed.  However, there are numerous disputes of material fact that preclude summary judgment.

Essentially every fact that is material to the outcome of this case is in dispute, including the following:

1.      When Lt. Ayers disclosed her disabilities to Chief Rogers. (Ex. 2; Ex. 11 at 28-29; Ex. 14 at 77-78.)

2.      What Lt. Ayers disclosed to Chief Rogers about her disabilities and limitations. (Ex. 2; Ex. 9; Ex. 11 at 29-32; Ex. 14 at 77-78.)

3.      Whether Chief Rogers informed Lt. Ayers of a list of expectations of her. (Ex. 11 at 23-28; Ex. 14 at 71-77.)

4.      Whether there were grounds for termination of Lt. Ayers in April 2021. (Ex. 1; Ex. 6.)

5.      Whether there were grounds for demotion of Lt. Ayers in April 2021. (Ex. 1; Ex. 7.)

6.      Whether Chief Rogers acted with discriminatory intent in demoting Lt. Ayers and denying her request for reasonable accommodations. (*See* all attached exhibits.)[7]

---

[7] As explained in part IV.A., below, from the totality of the facts, a jury can reasonably infer discriminatory intent.

7.      Whether Chief Rogers acted with retaliatory intent against Lt. Ayers' disabilities in demoting her and ordering the denial of her request for reasonable accommodations. (*See* all attached exhibits.)[8]

8.      The essential functions of the position of Special Operations Lieutenant. (Ex. 1; Ex. 2; Ex. 3; Ex. 4; Ex. 12 at 24-25; Ex. 13 at 8-9.)

9.      Whether Lt. Ayers was capable of performing the essential functions of the position of Special Operations Lieutenant. (Ex. 1; Ex. 2; Ex. 3; Ex. 4; Ex. 5; Ex. 9; Ex. 10; Ex. 12 at 13-15; Ex. 13 at 13-15.)

10.     Whether Lt. Ayers was capable of responding to service calls. (Ex. 1; Ex. 9; Ex. 10.)

11.     Whether Lt. Ayers was capable of engaging in police action. (Ex. 1; Ex. 9; Ex. 10.)

12.     Whether the Town engaged in the interactive process regarding Lt. Ayers' request for reasonable accommodations. (Ex. 1; Ex. 8; Ex. 9; Ex. 10.)

13.     Whether the Town could have accommodated Lt. Ayers. (Ex. 1; Ex. 8; Ex. 9; Ex. 10.)

## IV.    <u>Argument</u>.

## A.    **Plaintiff is a "qualified individual with a disability."**

The Town seeks summary judgment on Count I of the complaint, a claim for discrimination in violation of the ADA. To establish a claim for discrimination in under the ADA, a plaintiff must demonstrate that "(1) [she] was a qualified individual

---

[8] As explained in part IV.B., below, from the totality of the facts, a jury can reasonably infer retaliatory intent.

with a disability; (2) [she] was discharged [or subjected to other adverse employment action]; (3) [she] was fulfilling [her] employer's legitimate expectations at the time of discharge; and (4) the circumstances of [her] discharge raise a reasonable inference of unlawful discrimination." *Reynolds v. Am. Nat. Red Cross*, 701 F.3d 143, 150 (4th Cir. 2012) (internal quotation marks omitted). A "qualified individual" under the ADA is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

The Town's only argument against Lt. Ayers' claim for disability discrimination under the ADA is that she is not a qualified individual because she could not perform the essential functions of her position. That is true only as to the position to which the Town wrongfully demoted her. She was fully capable of performing all the essential functions of the position *from* which she was wrongfully demoted. Lt. Ayers' claim in this case is that after Chief Rogers learned of her disabilities and limitations, she demoted her for pretextual reasons to a position she knew she would be unable to fully perform due to her disabilities, then refused to reassign her to her prior position as a reasonable accommodation. In other words, Chief Rogers targeted Lt. Ayers by demoting her because she is disabled.

There is overwhelming evidence that Lt. Ayers could—and for many years did—perform all the essential functions of the position of Lieutenant. Lt. Ayers successfully served as the Lieutenant in charge of Special Operations from 2014 until her demotion in April 2021. (See Ex. 1; Ex. 2.) Former Chief Donnelly testified that

from the time he promoted Lt. Ayers in 2014 until he retired in 2020, she satisfactorily performed all the essential functions of the job. (Ex. 12 at 7-8, 13-15.) Former Acting Chief Zurolo, who was also Lt. Ayers' director supervisor, said the same. (Ex. 13 at 13-15.)

The Town argues that an essential function of Lt. Ayers' job was that she take "police action" and "physically respond to service calls if necessary." (Def. Mem. 16.) The Town does not define the term "police action" in its motion. In the Job Description for Patrol Sergeant, the term is referenced as an essential function of that position: ". . . takes police action as warranted (investigation, pursuit, apprehension, arrest, evident [sic] collection and preservation, etc.)." (Ex. 4, Sgt. Patrol Div. PD.) Plaintiff assumes for the purpose of this motion that the Town uses the term "police action" by this definition.

The Town's contention that the position of Special Operations Lieutenant includes taking police action and responding to service calls is contradicted by the Department's own Job Descriptions, the testimony of the two Chiefs who preceded Chief Rogers, and common sense. Under the ADA, an employer's job description "shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8). The Department's Job Descriptions for Patrol Sergeant and Special Operations Lieutenant differ in several important respects. The Job Description for Patrol Sergeant expressly states that the job includes, as an "essential function," taking "police action" and responding to service calls. (Ex. 4.) Specifically, the Job Description states as the first "essential function": "Responds to incidents requiring

13

a supervisor and takes other radio calls as appropriate; directs activities at the scene, providing information and assistance; calls for additional units as needed; takes police action as warranted (investigation, pursuit, apprehension, arrest, evident collection and preservation, etc.)." (Ex. 4 at 1.) These functions are not included in the Job Description for Special Operations Lieutenant. (Ex. 3.) The Job Description for Special Operations Lieutenant makes no reference to taking police action or responding to service calls. (Ex. 3.)

Further, the Job Description for Patrol Sergeant includes the following "Safety Considerations/Requirements": "The Patrol Sergeant works rotation shifts, and on weekends and holidays. The officer is subject to exposure to extreme weather conditions, armed/or dangerous and or violent persons, hostile or violent crowds, arrests of felons, persons with contagious diseases, and hazards associated with emergency driving and traffic control." (Ex. 4 at 3.) The Job Description for Special Operations Lieutenant does not include this or any similar requirement. (Ex. 3.)

"A job description, while relevant, is not dispositive of what constitutes the essential functions of a position. Instead, a court performing the essential functions inquiry must consult the full range of evidence bearing on the employer's judgment." *Balthrop v. Montgomery Cnty., Maryland*, 2022 WL 3867939, at *8 (D. Md. 2022) (internal quotation marks and citation omitted). Chief Donnelly testified that one distinction between the positions is that a Special Operations Lieutenant is not always required to wear a uniform. (Ex. 12 at 24-25.) He further explained that "[a] patrol sergeant is out on the road handling daily police calls for service, traffic

accident investigation, criminal – initial criminal investigations; whereas a lieutenant, which obviously is the next rank up, oversees, you know, what sergeant's doing or what others are doing." (Ex. 12 at 25.)

Capt. Zurolo, who served as commander of Special Operations before Lt. Ayers, confirmed that the position is "an office desk type job" and primarily "consisted of working in an office environment." (Ex. 13 at 8-9.)

In addition, common sense dictates that a command-level position, supervising divisions of officers, would be less physically demanding than a position in patrol. In a disability discrimination case brought by a police officer who was forced to retire after his eyesight diminished over the course of his nineteen-year career, the First Circuit Court of Appeals keenly observed: "Officers foreseeably age, losing some physical prowess but acquiring valuable experience and knowledge. And while a police department might prefer and expect new hires to be capable of assuming all entry-level positions, experienced officers are much more likely to acquire specific jobs, such as that of station officer." *Melo v. City of Somerville*, 953 F.3d 165, 169 (1st Cir. 2020) (citation omitted). *See also Wirtes v. City of Newport News*, 996 F.3d 234, 239-40, 243 (4th Cir. 2021) (remanding a police officer's disability discrimination claim for consideration of whether he could be exempt from patrolling assignments or from wearing a duty belt as reasonable accommodations).

The evidence and common sense show that the position Lt. Ayers was demoted *from* was less physically demanding and was a position for which she was fully capable of performing all the essential functions. In contrast, the position she was

demoted *to* was more physically demanding and one for which she was not able to perform all the physical elements of the position.

The Town makes a broad argument that every police officer, regardless of rank and position, must be able to take police action and respond to service calls if necessary. (Def. Mem. 16.) The Town fails to explain why police action and responding to service calls are expressly included in the Job Description for Patrol Sergeant, but not for Special Operations Lieutenant. But even assuming there are unwritten requirements that all officers must take police action and respond to service calls, Lt. Ayers was fully capable of performing these functions if necessary and outside the context of regularly working as a patrol officer. Her request for reasonable accommodations made it clear that her limitations and safety concerns were connected to a requirement that she regularly wear patrol shoes and that she be able to work in extreme heat for prolonged periods. (Ex. 8.) If she was permitted to wear non-patrol shoes to accommodate her foot drop and work in conditions that did not involve extreme heat, she was of course capable of responding to service calls and taking police action if necessary. (Ex. 1.) Her abilities are further evidenced by the fact that she successfully completed biannual firearms training, successfully completed all required in-service training, remained physically fit, and underwent and passed a psychological fit-for-duty evaluation. (Ex. 1; Ex. 5.) Moreover, there is no evidence she was physically incapable of performing these functions, as the Department failed to administer an agility test or any other evaluation of Lt. Ayers' physical capabilities at the time of her demotion and constructive discharge. (Ex. 1.)

There is, therefore, substantial evidence from which a reasonable jury can conclude that Lt. Ayers was capable of performing all the essential functions of the position of Special Operations Lieutenant. The Town's motion should be denied.

**B.    Plaintiff engaged in protected activity; there is evidence her demotion was retaliatory.**

The Town requests summary judgment on Count II of the complaint, a cause of action for retaliation in violation of the ADA. "The elements of a prima facie case for retaliation under the ADA are (i) the plaintiff engaged in ADA-protected activity; (ii) she later suffered an adverse employment action; and (iii) there is a causal link between the two." *Tartaro-McGowan v. Inova Home Health, LLC*, 91 F.4th 158, 173 n.10 (4th Cir. 2024). The Town contends that Lt. Ayers did not engage in protected activity and that it had nonretaliatory reasons for the actions it took against her. There is evidence to the contrary as to both issues.

Lt. Ayers disclosed her disabilities to Chief Rogers in a face-to-face meeting that took place between January 2-27, 2021 (she does not recall the precise date). (Ex. 11 at 30.) After learning of Lt. Ayers' disabilities and physical limitations, on April 21, 2021, Chief Rogers sent a lengthy email to Ms. Metzler, the Town's head of Human Resources, listing a litany of grievances against Lt. Ayers and stating that "she will be terminated from employment immediately." (Ex. 6.) It is notable that Chief Rogers deemed the numerous allegations against Lt. Ayers to warrant immediate termination. (Ex. 6.) Chief Rogers had been in the position for little more than four months. The previous two Chiefs, whose supervision of Lt. Ayers dated back more than six years, both testified that she performed well, they had no issues with her

17

performance or conduct, and they knew of no reason to demote, much less terminate, her as of the end of their tenures. (Ex. 12 at 21; Ex. 13 at 17.) Moreover, Chief Rogers did not undertake any investigation of her numerous allegations against Lt. Ayers, or even speak with Lt. Ayers about them, because an investigation "can take months." (Ex. 14 at 144-47.) (*See also* Ex. 1.) From these facts, a jury could reasonably infer that Chief Rogers' allegations against Lt. Ayers and her contention that they warranted immediate termination were fabricated or, at a minimum, grossly exaggerated.

Although Chief Rogers had asserted that Lt. Ayers committed numerous terminable offenses, just one week later, rather than terminating her, Chief Rogers demoted her to Patrol Sergeant "for administrative, non-punitive reasons." (Ex. 7.) The stated reasons were: "failing to wear your uniform at least 90% of the time; successfully handle personnel issues; recommend a uniform for Street Crimes Unit; engage with your division team members; and research improvements for the property room security." (Ex. 7.)

Chief Rogers testified that the only reason she issued the demotion for "administrative, non-punitive reasons" is because if she had taken action for "punitive reasons" it would have been a termination, which would have implicated Lt. Ayers' procedural rights under the LEOBR. (Ex. 14 at 150-51.) In other words, by demoting Lt. Ayers, Chief Rogers was able to take adverse action against her without giving her a right to notice, an opportunity to respond, and a hearing.

Furthermore, if, as Chief Rogers claimed, Lt. Ayers had engaged in conduct that warranted immediate termination, it would have been nonsensical to demote her, keeping her in the Department in a supervisory position. Chief Rogers' claim that Lt. Ayers was an immediate threat to her Department who had to be removed is irreconcilable with her decision to demote her for administrative, non-punitive reasons, unless the demotion was effectively a termination. A jury may reasonably find that Chief Rogers knew about Lt. Ayers' disabilities and limitations, which were clearly incompatible with the position of Patrol Sergeant. Thus, by demoting Lt. Ayers to a position she could not fully perform due to her disabilities, Chief Rogers was forcing her to retire or be terminated without having to prove her allegations or give Lt. Ayers any due process.

From these facts, a jury can reasonably conclude that there is a causal link between Lt. Ayers' disclosure of her disabilities and Chief Rogers' demotion of her to Patrol Sergeant. This theory is even stronger under Lt. Ayers' MFEPA claim, which provides for liability even if the plaintiff's protected category or protected activity was just one of multiple reasons for the adverse action. *Jennings v. Frostburg State Univ.*, 679 F. Supp. 3d 240, 275 (D. Md. 2023) (noting that "MFEPA's 'on the basis of' standard is more relaxed and permits mixed-motive arguments").

On May 13, 2021, Lt. Ayers engaged in protected activity by requesting a reasonable accommodation. (Ex. 8.) Six days later, on May 19, 2021, Chief Rogers responded hostilely and aggressively in an email to Ms. Metzler and other staff demanding that Lt. Ayers' request be denied. (Ex. 9.) She homed in on Lt. Ayers'

reference to cognitive challenges and physical limitations, while ignoring that these were connected to prolonged exposure to extreme weather and temperature changes, i.e., issues that arise in the position of Patrol Sergeant, but not Special Operations Lieutenant. (Ex. 9.) Chief Rogers lashed out at Lt. Ayers, saying she "had a lawful and moral obligation to inform me as the Chief Law Enforcement Officer in this agency of her physical and mental limitations." (Ex. 9.) (Of course, she had months earlier and was doing so again by submitting a reasonable accommodation request regarding her physical limitations; she does not have mental limitations.) Chief Rogers even said "[t]his should be reported to the Maryland Police and Corrections Training Commission immediately" (Ex. 9), though she later admitted she did not submit such a report (which would have been frivolous) (Ex. 14 at 163-64).

Approximately one month later, in accordance with Chief Rogers' directive, Ms. Metzler informed Lt. Ayers that her request for a reasonable accommodation was denied. (Ex. 10.) Ms. Metzler's denial letter parroted the statements in Chief Rogers' response email from a month earlier. (Ex. 10.)

Given Chief Rogers' documented animosity toward Lt. Ayers, her harsh and dismissive initial response to Lt. Ayers' request for accommodations, her demand to Ms. Metzler that the request be denied, and the fact that Ms. Metzler's denial letter echoed Chief Rogers' initial response, a jury could reasonably conclude that the Town's denial of Lt. Ayers' request for reasonable accommodations was retaliatory for her protected activity of making the request.

The Town further argues that Lt. Ayers' retaliation claim fails because she allegedly "failed to meet the expectations of the Lieutenant position as set forth by Chief Rogers." (Def. Mem. 24.) The Town states that at the outset of her tenure Chief Rogers "decided in December 2020 to allow Plaintiff a chance to prove herself as a member of that Command Staff." (Def. Mem. 25.) This is patently absurd, given that (a) Lt. Ayers had been fully performed her duties as a member of the command staff—without any performance or conduct issues—for over six years, and (b) Chief Rogers admits that she was already looking for a basis to terminate Lt. Ayers. In fact, it is clear from Chief Rogers' testimony that she harbored a longstanding grudge against Lt. Ayers and was intent on terminating her, even without any valid basis for doing so.

The Town further argues that in her April 21, 2021 "Letter of Concern," Chief Rogers advised Ms. Metzler of "a number of deficiencies in Plaintiff's performance." (Def. Mem. 25.) Chief Rogers' complaints and accusations against Lt. Ayers are entirely based on hearsay. She claims to have had conversations with Sgt. Odom, Cpl. Joshua Leffew, OFC David, OFC Shannon Comley, Lt. Kathy Ford, Sgt. Dave Confer, and other unnamed members of CID and SCU, all of whom allegedly expressed various complaints about Lt. Ayers. (Ex. 6.) None of these individuals has testified to any alleged complaints about Lt. Ayers. None were deposed. The Town failed to present any affidavit testimony by any of these officers. In fact, there is nothing in writing at all to support any of the alleged complaints about Lt. Ayers, except Chief Rogers' Letter of Concern.

Chief Rogers' self-serving hearsay recounting alleged conversations with third parties is not admissible at trial and therefore may not be considered for purposes of a motion for summary judgment.[9] *Giles v. Nat'l R.R. Passenger Corp.*, 59 F.4th 696, 704 (4th Cir. 2023) ("Courts in the Fourth Circuit may not consider inadmissible evidence on a motion for summary judgment").

Moreover, the various hearsay allegations by Chief Rogers are not even the reasons for which she allegedly demoted Lt. Ayers. Just days after her lengthy catalogue of alleged failures and infractions by Lt. Ayers—after which she asserted that Lt. Ayers "will be terminated from employment immediately"—Chief Rogers issued the Demotion Letter stating that she was demoting Lt. Ayers "for administrative, non-punitive reasons." (Ex. 7.) The reasons are different from those listed in her Letter of Concern: "failing to wear your uniform at least 90% of the time; successfully handle personnel issues; recommend a uniform for Street Crimes Unit; engage with your division team members; and research improvements for the property room security." (Ex. 7.)

A plaintiff may prove pretext "by showing 'such weakness, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence.'" *Madison v. Hous. Auth. of, Baltimore City*, 2021 WL 2936321, at *4 (D. Md. 2021) (quoting *Fordyce v. Prince George's Cnty. Md.*, 43 F.

---

[9] Even so, Lt. Ayers has rebutted each of Chief Rogers' allegations. (*See* Ex. 1.) Thus, not only is there no admissible evidence to support Chief Rogers' allegations, the only evidence as to these issues is Lt. Ayers' attestation rebutting them.

Supp. 537, 550 (D. Md. 2014)). In this case, Chief Rogers' alleged reasons for wanting to terminate Lt. Ayers were based entirely on hearsay; there is no documentary support for the alleged allegations; none of the officers who allegedly complained about Lt. Ayers have testified in this case or offered any written statement in support; one week after stating that Lt. Ayers would be terminated immediately based on these allegations, Chief Rogers instead demoted her for "administrative, non-punitive reasons," which was inconsistent with her statement days earlier; the stated reasons for Lt. Ayers' demotion are different from those listed in Chief Rogers' lengthy Letter of Concern; Chief Rogers never raised any of these concerns with Lt. Ayers contemporaneously; and Lt. Ayers has factually rebutted all of Chief Rogers' allegations against her (*see* Ex. 1). These facts present strong evidence from which a jury can find pretext.  The Town's motion should be denied.

## C.    The Town failed to provide a reasonable accommodation.

The Town requests that the Court grant summary judgment on Count III of the complaint, a claim for failure to grant a reasonable accommodation in violation of the ADA. Under the ADA, an employer must make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A). To establish a claim for failure to accommodate, a plaintiff must show "(1) that [she] was an individual who had a disability within the meaning of the statute; (2) that the

[employer] had notice of [her] disability; (3) that with reasonable accommodation [she] could perform the essential functions of the position ...; and (4) that the [employer] refused to make such accommodations." *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 345 (4th Cir. 2013) (internal quotation marks omitted).

The Town argues again that Lt. Ayers was not a qualified individual with a disability under the ADA because, it contends, Lt. Ayers could not perform the essential functions of her position. This argument is wrong for the reasons explained in part IV.A., above, including that the Town focuses on the wrong job.

The Town further argues that Lt. Ayers' requested accommodation, to remain in her position as Special Operations Lieutenant, was not reasonable, and therefore, it was not required to offer her this accommodation. (Def. Mem. 28-29.)

The EEOC defines "reasonable accommodation" in relevant part as:

(ii) Modifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position; or

(iii) Modifications or adjustments that enable a covered entity's employee with a disability to enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without disabilities.

29 C.F.R. § 1630.2(o)(1).

Reasonable accommodations may include "[j]ob restructuring; part-time or modified work schedules; reassignment to a vacant position; . . . appropriate adjustment or modifications of examinations, training materials, or policies; . . . and other similar accommodations for individuals with disabilities." 29 C.F.R. §

1630.2(o)(2)(ii). *See also* COMAR 14.03.02.05(B) (listing similar examples of reasonable accommodations under MFEPA).

Furthermore, "[t]o determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the individual with a disability in need of the accommodation." 29 C.F.R. § 1630.2(o)(3). "This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." *Id.*

In this case, the Town did not seriously consider Lt. Ayers' requested accommodation, did not engage in an interactive process *at all*, and did not offer *any* reasonable accommodations. To begin with, the Town's contention that Lt. Ayers' requested accommodation was unreasonable is based on a willful misreading of her request. In her request, she explained that her MS caused her to experience various symptoms relating to extreme weather and changes in temperature. (Ex. 8.) Throughout her request, she expressly connected her symptoms to "weather," "temperature change," and "temperature regulation." (Ex. 8.) She stated that she could not perform all the listed requirements of the position of Patrol Sergeant and specifically noted that the Job Description provides that "[t]he officer is subject to exposure to extreme weather conditions." (Ex. 8.) She requested that she not be assigned to Patrol Sergeant and be permitted to continue performing the same duties she had successfully performed as Special Operations Lieutenant for more than six years. (Ex. 8.)

The Town repeatedly asserts that Lt. Ayers requested a "sedentary" job. This one-word descriptor glosses over the details of how Lt. Ayers' described her job needs. Specifically, when asked to describe "possible accommodation(s)," Lt. Ayers stated:

> My request involves not changing my job duties to involve things that are unsafe to me and others due to my disabilities. The job functions I performed for years allowed for no expectation of first responder functions that I could not perform safely. The duties I performed were sedentary in nature and I did not have issues with long walks or running. The hours were not lengthy, did not exacerbate fatigue without having the flexibility of taking time off or breaks as needed for this issue. The duties involved a temperature-controlled facility that I could work with to avoid further complications. I was provided access to restroom facilities and generally was able to regulate meals as needed. It was also understood that MS involves being subject to flares in which I need to leave work and rest to heal if they occur. MS is associated with unpredictability and it is unclear if or when a flare will occur.

(Ex. 8 at 2.)

Lt. Ayers' description of some of the elements and accommodations inherent in the position of Special Operations Lieutenant is entirely accurate and consistent with the Department's Job Description for this position, Lt. Ayers' own experience, as well as the testimony of her two prior Chiefs. The Job Description for Special Operations Lieutenant makes no reference to first responder functions or working for prolonged periods outdoors. (Ex. 3.) Former Chief Donnelly identified one of the major differences between the positions of Special Operations Lieutenant and Patrol Sergeant as "scheduling," explaining that "detectives generally are Monday through Friday workers. One or more of them always on call 24/7/365, whereas patrol generally, you know, my experience, patrol is shift work . . . [Lieutenant] [n]ot always but is, again, a -- scheduling-wise is a person working primarily Monday through

Friday, you know, regular daylight hours, but not restricted to that schedule or those hours." (Ex. 12 at 24-25.) He further explained that "[a] patrol sergeant is out on the road handling daily police calls for service, traffic accident investigation, criminal – initial criminal investigations; whereas a lieutenant, which obviously is the next rank up, oversees, you know, what sergeant's doing or what others are doing." (Ex. 12 at 25.) Former Acting Chief Zurolo testified that when he was previously the commander of Special Operations, "pretty much my day consisted of working in an office environment." (Ex. 13 at 9.) Asked whether the job was "essentially an office desk type job where you worked from the police department headquarters as opposed to being out on the street as you did when you were a patrol officer," Capt. Zurolo testified: "Yeah, that's correct. I was part of the chief's command staff." (Ex. 13 at 9.)

"Sedentary" means "doing or requiring much sitting," i.e., "a *sedentary* job." *Merriam-Webster Dictionary*.[10] Despite the Town's protestations that Lt. Ayers could not be placed in a "sedentary" job, the evidence shows that the position of Special Operations Lieutenant is primarily sedentary. The Town could have placed her in such a job. In fact, she had performed the job successfully for over six years.

After Chief Rogers immediately rejected Lt. Ayers' reasonable accommodations request and demanded that it be denied (Ex. 9), the Town never engaged in an interactive process with Lt. Ayers. Instead, it fixated on the word "sedentary" and incorrectly asserted that there was no job she could perform in the Department. (Ex. 10.) It never made a good faith attempt to "identify the precise limitations resulting

---

[10] Available at https://www.merriam-webster.com/dictionary/sedentary.

from the disability and potential reasonable accommodations that could overcome those limitations," 29 C.F.R. § 1630.2(o)(3), such as by talking to Lt. Ayers about her limitations, communicating with her doctors, or giving her an agility test or other physical or medical evaluation. Instead, on Chief Rogers' orders, the Town rejected Lt. Ayers' request out of hand.

In effect, Lt. Ayers' request was for a reassignment back to her position as Special Operations Lieutenant. After she was demoted, her former position was open. She was not seeking any changes to that position. She simply requested that she be reassigned back to the position she was able to perform with her disabilities, rather than being demoted to a position she could not perform due to her disabilities. At the same time, her request could reasonably be interpreted as a request for reassignment to any position in the Department that enabled her to continue to serve as a police officer without the requirements of wearing a uniform or prolonged outdoor activity as an essential function, or reassignment to a position with adjustment of job duties to address these issues. However, based on the Town's disingenuous assertion that it had no positions that could accommodate Lt. Ayers in the Department, it failed to offer her *any* accommodation, instead simply listing other non-law enforcement jobs that were open in the Town and suggesting that she could apply for them. (Ex. 10.)

Based on this evidence, a jury could reasonably find that the Town violated the ADA by failing to grant Lt. Ayers a reasonable accommodation. The Town is not entitled to summary judgment on this count.

28

**D.      The Town's motion should be denied as to Lt. Ayers' MFEPA claims.**

The Town argues that the Court should grant summary judgment on Lt. Ayers' MFEPA claims, Counts IV, V, and VI of the complaint, for the same reasons it argues for summary judgement as to her ADA claims. (Def. Mem. 29-30.) Generally, MFEPA is interpreted consistently with the ADA. *Miller v. Maryland Dep't of Nat. Res.*, 813 F. App'x 869, 874 (4th Cir. 2020). The Town's motion fails as to Lt. Ayers' MFEPA claims for the same reasons it fails on her ADA claims.

As noted above, however, MFEPA differs from the ADA in that it provides for liability under a mixed-motive theory. *Jennings v. Frostburg State Univ.*, 679 F. Supp. 3d 240, 275 (D. Md. 2023). For this additional reason, the Town's motion should be denied as to Lt. Ayers' MFEPA claims.

**V.      <u>Conclusion.</u>**

For the foregoing reasons, Lt. Ayers requests that the Court deny the Town's motion for summary judgment in its entirety.

<u>**REQUEST FOR HEARING**</u>

In accordance with L.R. 105.6., Lt. Ayers requests a hearing on this motion.

Respectfully submitted,

/s/ Joseph M. Creed
Joseph M. Creed (Bar No. 17134)
Bramnick Creed, LLC
4550 Montgomery Ave., Suite 760N
Bethesda, MD 20814
(301) 945-7800
jcreed@bramnickcreed.com

/s/ Brian J. Markovitz
Brian J. Markovitz (Bar No. 15859)
Joseph, Greenwald & Laake, P.A.
6404 Ivy Lane, Suite 400
Greenbelt, MD 20770
(301) 220-2200
bmarkovitz@jgllaw.com

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on October 18, 2024, a copy of the foregoing was filed and served on all counsel of record via the Court's ECF e-filing system.

/s/ Joseph M. Creed
Joseph M. Creed